IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Pauline E. Lasher, | ) | Civil Action No.6:06-1681-GRA-BHH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Day & Zimmerman International, Inc., | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on the defendant's motion for summary judgment [Docs. 33 & 52] pursuant to Federal Rule of Civil Procedure 56.   The plaintiff has pled claims for hostile work environment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, as amended.  The plaintiff has also pled state law claims for negligent retention and intentional infliction of emotional distress.  The defendant originally interpreted the plaintiff's Complaint to also plead a wage disparity claim.  The plaintiff has indicated that she intended no such claim.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTUAL BACKGROUND**

The defendant is a commercial builder that provides contract services for development and renovation.  (See generally Rivet Aff.)  It hired the plaintiff on January 6, 2003 as a Business Development Manager in Greenville, South Carolina.  (Lasher Aff. ¶ 2.)  She was interviewed and hired by Guy Starr, Vice President of Operations for Greenville, South Carolina.  Starr was the plaintiff's eventual "dotted line" supervisor,

meaning that he was not her direct report but that he had supervisory authority over her and that they interacted on a frequent basis.  (Id. ¶ 19; Bouknight Aff. ¶ 3.)

The plaintiff claims that Starr did not like females in the construction industry and described her as a "token" interview prior to hiring her.  (Lasher Dep. at 15-16.)  The plaintiff further claims that Starr harassed her on account of his alleged discriminatory animus for the entire time of her employment.  Specifically, the plaintiff alleges that he was verbally abusive and demeaning and that he would undermine the effectiveness of her work by sending male co-workers with her on client visits.  (See Carter Aff. ¶ 5; Bouknight Aff. ¶ 4.)

The plaintiff also contends that a co-worker, Tom Sims, made various sexual advances towards her, which she did not reciprocate.   (Lasher Dep. at 13.)  The plaintiff reported Sim's conduct and an investigation was conducted.  (Def. Mem. Summ. J. Ex. 1 at Def. Ex. 16 (Investigation Report).)  As a result, Sims was disciplined.  (Def. Mem. Summ. J. Ex. 5 (Employee Counseling Report).)

The plaintiff contends that the conduct of Starr and Sims constituted a hostile work environment.  She further contends that when she finally reported Starr's conduct, on January 12, 2004, she was retaliated against for it, only four days later, when her employment was terminated on January 16, 2004, as part of, what the defendant contends, was a nine employee layoff.

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue.  *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported
> as provided in this rule, an adverse party may not rest upon the
> mere allegations or denials of the adverse party's pleadings,

3

> but the adverse party's response, by affidavits or as otherwise
> provided in this rule, must set forth specific facts showing that
> there is a genuine issue for trial.  If the adverse party does not
> so respond, summary judgment, if appropriate, shall be entered
> against the adverse party.

Fed.R.Civ.P. 56(e).  Accordingly, when Rule 56(e) has shifted the burden of proof to the

non-movant, he must produce existence of every element essential to his action that he

bears the burden of adducing at a trial on the merits.

## DISCUSSION

### I.    Hostile Work Environment

The plaintiff's first claim is one for hostile work environment[1] based upon the alleged

harassment of two co-workers, Guy Starr and Tom Sims.  The plaintiff claims that Starr, her

supervisor, discriminated against her in various ways, based upon her sex, with sufficient

severity and regularity such that his actions constituted a hostile work environment.  The

plaintiff also contends that Sims, a co-worker, separately, made unwelcome sexual

advances toward her, which were not reciprocated and which the defendant did nothing to

stop.  The alleged actions of Starr and Sims form separate bases for consideration, as they

arise out of distinct sets of operative facts.  The plaintiff does not argue, and the Court is

unaware of, any reason to consider them as having, together, created a hostile

environment.  The Court, like the parties, will address the actions of Starr and Sims, in turn.

---

[1]    It should be noted that although the plaintiff's employment was eventually terminated, the plaintiff has not pled a discriminatory discharge claim pursuant to Title VII. She does not claim, either in her Complaint or now on summary judgment, that her employment was *terminated* because of her sex.  Instead, she argues that she was terminated in retaliation for making complaints concerning alleged sexual harassment. (See, e.g., Compl. ¶ 12.)  Accordingly, the Court will only analyze the plaintiff's first cause of action as one for severe and pervasive sexual harassment, which has resulted in a "constructive alteration in the terms or conditions of employment."  *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ("The principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive.")

4

### A.    Conduct of Starr

As stated, the plaintiff contends that Starr was verbally abusive and demeaning and would require male co-workers to accompany her on client visits. The plaintiff also contends that Starr was public with his belief that women could not be successful in the construction industry.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This provision "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Title VII is violated "[w]hen the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted).

To state a claim for hostile work environment or sexual harassment, the plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on her race or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Ocheltree v. Scollon Productions, Inc.,* 335 F.3d 325, 331 (4 th Cir. 2003); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997). The requirement that harassment be "because of sex" does not mandate that the harassment include sexual advances or propositions. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 2412 (4th Cir. 2000).

5

### 2.    Sex Based Harassment

As to the first element of her case, there is no debate between the parties that Starr's treatment of the plaintiff was "unwelcome."    Instead, the defendant initially contends that the plaintiff has not produced any evidence that Starr harassed her *because* of her sex. The Court disagrees.

The plaintiff has produced the following evidence that Starr was motivated to harass the plaintiff, in the manner alleged, on account of her sex:

- During her initial interview for the job, Starr told the plaintiff that she was considered a "token interview":

> A:    Guy Starr actually said that he needed to have a token interview, female interview with this President because they had government contracts.  And wanted to know – he had told the President he only knew of two females that he could get for an interview, that he only knew of two interviews that could qualify for this token interview, a minority interview.  And so, he says, "I know of" – I don't know where one was, but he said, "The one in Augusta, Georgia, I don't know if we can get her or not."
>
> Q:    So, you were that one?
>
> A:    That's the one I was.

(Lasher Dep. at 15-16.)

- Starr expressed to Tex Carter, the plaintiff's immediate supervisor, that "he did not believe that women could successfully sell in the construction industry." (Carter Aff. ¶ 5.)

- Starr sent male co-workers with the plaintiff on sales calls to "over-look" her work. *Id*.  Both Carter and Hal Bouknight, the former President of the defendant's Greenville Business Unit, have offered testimony that this practice was (1) "demeaning"; (2) a reflection of Starr's prejudices against women in the construction

6

industry; and (3) done specifically to harass the plaintiff on account of her sex.  (See Carter Aff. ¶ 5; Bouknight Aff. ¶ 4.)

- Starr would criticize the plaintiff as "incompetent" and "the female door opener" in front of other team members.  (Bouknight Aff. ¶ 4.)

- The plaintiff swears that "on many occasions" Starr "made it clear" to her that he did not think that women should be selling to accounts in the construction industry. (Lasher Aff. ¶ 7.)

- Starr "would openly speak negatively about Ms. Lasher," harassed her,  and treated "her in demeaning ways."  (Id.; Carter Aff. ¶ 5.)

- In spite of allegedly better job performance (see Bouknight Aff.¶ 5), her salary remained less than two male workers who performed the same sales functions. (Lasher Dep. at 144.)

In response to this evidence the defendant argues that many of these remarks were made out of the plaintiff's presence.  The argument is unavailing.  First, not all were -- most notably, the "token interview" comment.  Second, the evidence cited above relates to Starr's motivation – whether he acted in the ways alleged because of the plaintiff's sex.  Obviously, to be actionable, the plaintiff must also produce evidence of harassing conduct *in her presence* that was either severe or pervasive.  But, for the singular point, contested in the first instance by the defendant, that Starr was, in fact, motivated on account of the plaintiff's sex, a jury may consider both comments made in the plaintiff's presence as well as those made outside of her presence, but consistent with her account.  *See Jennings v. University of North Carolina*, 482 F.3d 686, 703 n.* (4th Cir. 2007) (concurring with the majority as to this point specifically); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir.1997) ("[I]ncidents . . . occurring before [plaintiff's] tenure may be of limited probative value, but cannot be ignored on summary judgment.").   Accordingly, all of the above evidence is relevant.

7

The defendant also contends that the phrase "incompetent," while derogatory, is not related to the plaintiff's sex and the phrase "female door opener," while related to sex, is not derogatory. Bouknight specifically disagrees, and has stated that he and other management indicated to Starr that these "were unacceptable comments." (Bouknight Aff. ¶ 4.) A jury may very well, and with reasonable justification, believe Bouknight over the defendant as to both the derogatory and sex-based motivation of such comments.

Finally, the defendant recites inconsistencies in the testimony of the plaintiff and the affidavits of Bouknight and Carter, which it contends prove that sex was not the motivating factor in Starr's treatment of the plaintiff. Specifically, while the plaintiff claims she was a "token interview" Carter has stated that the plaintiff was "hired because of Guy Starr's strong belief that this would be a good way for DZ to enter the industrial market in Augusta, Georgia and Pauline was a key to selling in this market." (Carter Aff. ¶ 3.) The defendant also highlights that Bouknight has indicated that it was not the practice of Starr to send male co-workers on sales calls with other female employees of the defendant, suggesting that Starr's motivation for doing so with the plaintiff was unrelated to her sex. (Bouknight ¶ 4.) While the defendant's arguments may have impeachment value, at trial if necessary, it is not the duty of the Court at summary judgment to weigh or compare the respective pieces of evidence. It is enough that the plaintiff has submitted evidence, as recited above, that if believed by a reasonable jury could demonstrate that Starr was motivated to harass the plaintiff on account of her sex.

It should be noted that the defendant has highlighted from the plaintiff's deposition her purported admission that she did not consider any conduct of Starr to be "sexual harassment." (Id. at 177.) It is fairly plain from context that the plaintiff meant simply to indicate that Starr never made any sexual advances towards her. Her statements at deposition do not undermine the plaintiff's consistent position that Starr's general harassment of her was on account of her sex.

8

Accordingly, the plaintiff has created a genuine issue of fact as to whether Starr's alleged harassment was based on her sex.

### 3.    Severe or Pervasive

The defendant next contends that Starr's alleged conduct was neither severe nor pervasive.  The defendant emphasizes that there is no "federal cause of action for mere unpleasantness," *Hartsell v. Duplex Products, Inc.*, 123 F.3d 766, 773 (4 th Cir. 1997), and the plaintiff has complained of nothing more, in this case.

The harassment must be both objectively and subjectively severe or pervasive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21(1993).  In conducting the subjective inquiry the Court need only look at the testimony of the plaintiff.  *E.E.O.C. v. R&R Ventures,* 244 F.3d 334, 339 (4th Cir. 2001).  There is no dispute among the parties that the plaintiff perceived Starr's treatment as severely and pervasively abusive.

As to the objective severity or pervasiveness of the harassment, it is judged from the perspective of a reasonable person in the plaintiff's position.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81(1998).   Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

### a.    Frequency of conduct

The Court is persuaded that the plaintiff has put forward some evidence that the alleged conduct was frequent.  Assuming that a jury found that he was discriminatorily motivated, it could also conclude based on the evidence of record that Starr's alleged conduct occurred with material frequency.  The following evidence creates genuine issues of fact in that regard:

- The affidavits of Bouknight and Carter indicate, both expressly and impliedly, that Starr _often_ (1) treated the plaintiff in demeaning ways and (2) inappropriately criticized her during meetings. (Bouknight Aff. ¶ 4; Carter Aff. ¶ 5.)

- The affidavits of Bouknight and Carter further indicate that it was a regular practice to send male counterparts with the plaintiff on sales calls, which both Bouknight, Carter, and the plaintiff interpreted as sex-based harassment. (Id.; Lasher Aff. ¶ 7.)

- The plaintiff herself has testified and submitted an affidavit that she was subject to almost constant harassment from Starr. The plaintiff swears that "on many occasions" Starr "made it clear" to her that he did not think that women should be selling to accounts in the construction industry. (Lasher Aff. ¶ 7.)

A reasonable jury could conclude from the above evidence that Starr frequently harassed the plaintiff.

### b.    Severity of conduct

The Court also finds that there is a genuine issue of fact as to the severity of the alleged conduct. As stated, Bouknight and Carter have both testified that Starr's regular treatment of the plaintiff was "demeaning," "harassing," "very negative," and "unacceptable." (Bouknight Aff. ¶ 4; Carter Aff. ¶ 5.) Moreover, the evidence demonstrates that Starr "openly" criticized the plaintiff, which a jury might find additionally humiliating. See *id.* The plaintiff, herself, has testified that Starr "fussed" at her and on at least one occasion used "a very loud tone, brutal tone, and not nice" and that she knew she "was the enemy in his eyes." (Lasher Dep. at 98.) Concerning that same incident, the plaintiff has stated that she "was trying to survive the meeting. . . . I wanted to just get through the meeting because I knew that – I felt that he was trying to get me to quit in that meeting." *Id.* Although the plaintiff alleges that Starr regularly abused her with profanity, including the word "bitch," the plaintiff has not identified any evidence of such language, even in her own affidavit.

The defendant, of course, highlights evidence and testimony to the contrary. For example, the defendant claims that the plaintiff, in fact, does not allege that Starr "fussed at her." (Lasher Dep. at 187.) The Court, however, will not weigh the evidence. It is enough that the plaintiff has submitted evidence from which a reasonable jury could conclude that the alleged harassment was severe, if believed.

### c.     Effect on work performance

Finally, some issue of fact exists as to whether Starr's alleged conduct unreasonably interfered with the plaintiff's work performance and thereby altered the terms and conditions of her employment. It is the testimony of Bouknight that Starr's alleged treatment was "counterproductive" to the plaintiff's sales efforts and was "very negative and harassing" to the plaintiff. (Bouknight Aff. ¶ 4.) Carter has also indicated that it was clear to him that Starr was attempting "to replace [the plaintiff] with some of these male associates." (Carter Aff. ¶ 5.) Carter was also allegedly asked by Starr not to send the plaintiff "on calls with clients that she had been successfully developing as potential clients." *Id*. Carter has specifically stated that "[b]y sending males with [the plaintiff] on calls, he subverted her effectiveness as a sales person while at the same time he was attempting to open the door for the male associate for later calls." *Id*. In addition, the plaintiff has testified that Starr attempted to fire her on a at least two occasions. (Lasher Dep. at 80-81; 185.)

Based on this testimony and in conjunction with other evidence of harassment already discussed, a reasonable jury could conclude that Starr's alleged conduct unreasonably interfered with the plaintiff's work performance.

The Court is aware that the Fourth Circuit does not "countenance a federal cause of action for mere unpleasantness." *Hartsell*, 123 F.3d at 773. And, "Title VII is not a federal guarantee of refinement and sophistication in the workplace - in this context, it prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Id*. Notwithstanding, the plaintiff has put forward evidence that a litany

of alleged harassing conduct was all attributable to Starr's confessed bigotry towards women in the construction industry. Therefore, genuine issues of fact exist as to the severity and pervasiveness of the alleged conduct; a reasonable jury might conclude that it went beyond mere unpleasantness and occasional cruelty, as the defendant describes it.

### 4.    Employer Liability

Finally, the defendant challenges that the alleged conduct of Starr can be imputed to it for purposes of liability for a hostile work environment claim. It is undisputed that Starr was one of the plaintiff's supervisors.

The defendant claims that, as a matter of law, the *Faragher/Ellerth* affirmative defense protects it from being held liable for Starr's alleged misconduct. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). In *Ellerth* and *Faragher*, the Supreme Court established the rules for employer liability when the harassing individual is a supervisor. The Supreme Court distinguished between two situations: those in which the supervisor's harassment resulted in "a tangible employment action," such as discharge, demotion, or undesirable reassignment, and those in which it did not. *Ellerth*, 524 U.S. at 765. In the former situation, the employer's vicarious liability is strict, in the sense that no defense is available once the other elements of the case have been proven. *Id*. If, however, the harassment is not accompanied by, or does not result in, any tangible employment action, then the employer is entitled to defeat the plaintiff's case by showing that (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id*.

The plaintiff first argues that the *Faragher/Ellerth* affirmative defense is inapposite because there was, in fact, a tangible employment action, namely the alleged attempt to fire

12

her (Lasher Dep. at 80-81) and other mistreatment by Starr including his decision to have male co-workers accompany her on sales calls.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (emphasis added). None of the alleged treatment by Starr rises to the level of a tangible employment action as defined by the Fourth Circuit.

First, the evidence only suggests that Starr may have wanted the plaintiff fired. (Lasher Dep. at 80-81.) Although the plaintiff was given a counseling report at the request of Starr for condescending behavior, a non-compete incident, and involving colleagues in a conspiracy, it is not alleged that the discipline ever resulted in a firing, reassignment, denial of promotion, or any significant change in her benefits. Second, sending male co-workers with the plaintiff does not constitute a significant change to the plaintiff's employment status. A mere change in an employee's job assignment, even if "less appealing to the employee, . . . does not constitute adverse employment action." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). Accordingly, the Court concludes that Starr's alleged conduct did not result in a tangible employment action against the plaintiff and, therefore, the defendant may avail itself of the affirmative defense, as described above, if it can show that both elements have been satisfied.

As to the first element of the affirmative defense – whether the employer has proved that it exercised reasonable care to prevent and correct the harassment – the record reflects that the defendant had in place an anti-harassment policy designed to deter sexual harassment. (Def. Ex. 17 to Lasher Dep.) The plaintiff does not contend otherwise. The Fourth Circuit has recognized that an employer can still meet its burden as to the first element without such a policy, but that mere promulgation of such a policy may well fail to

satisfy the employer's burden. *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999) (citing *Faragher*, 118 S.Ct. at 2293; *Ellerth*, 118 S.Ct. at 2270. Normally, however, where there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer "exercised reasonable care to prevent" and promptly correct sexual harassment. *Faragher*, 118 S.Ct. at 2293; *accord Lissau*, 159 F.3d at 182. But, "the employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual." *Brown*, 184 F.3d 388.

Although the plaintiff does not so specifically argue, the Court is inclined to conclude, that an issue of fact exists as to whether the defendant exercised reasonable care in the administration of its policy. Namely, it is the testimony of Bouknight and Carter not only that Starr was regularly and publically demeaning towards the plaintiff but that his discriminatory animus against women in construction was equally well publicized. (Bouknight Aff. ¶ 4; Carter Aff. ¶ 5.) Bouknight has offered testimony that many of these remarks were made in internal and management-team meetings. (Bouknight Aff. ¶ 4.) In fact, Bouknight has stated that the management team confronted Starr concerning his "unacceptable comments." *Id.* Notwithstanding the apparent knowledge of management personnel concerning both Starr's alleged conduct and alleged discriminatory motivation, the record suggests that no meaningful steps were taken by the defendant to curb the alleged harassment. Accordingly, some issue of fact remains as to the first element of the affirmative defense.

With regard to the second element, there is also an issue of fact as to whether the plaintiff unreasonably delayed in availing herself of the defendant's harassment policy and procedures. The plaintiff reported Starr's conduct on January 12, 2004, (Lasher Aff. ¶ 8; Rivet Dep. at 66) four days before the termination of her employment, and almost a year

14

after she contends the harassing conduct began.     Whether an employee has taken advantage of corrective opportunities is an issue of fact, *Lissau*, 159 F.3d at 184, and it would be improvident for the Court to resolve the issue on summary judgment.  Accordingly, issues of fact exist as to the second element of the defendant's *Faragher/Ellerth* defense, as well.

For all these reasons, the defendant's motion for summary judgment as to the plaintiff's hostile work environment claim concerning Starr's conduct should be denied.

**B.     Conduct of Sims**

The defendant next contends that no genuine issues of fact exist as to the plaintiff's claim for hostile work environment regarding the actions of a co-worker, Tom Sims.  The plaintiff has submitted evidence of three instances in which she believes she was sexually harassed by Sims.

First, she claims that her and Sims went to a Macaroni Grill restaurant for drinks and that at some point during their time there, Sims clasped her hands to see if she could "talk without [her] hands."  (Lasher Dep. at 134.)  She has testified that Sim's conduct "scared" her.  *Id.*  Sims has admitted to clasping her hands.  (Sims Dep. at 26-27.)  The plaintiff then claims that, as she was straightening up her jacket, Sims said, "Don't do that.  I finally got a look at those and they are beautiful," apparently referring to her breasts, at which she claims he was staring.  (Id. at 138.)  The plaintiff claims that when Sims dropped her off, he parked in the back of the hotel where she was staying, in a secluded part of the parking lot.  She further claims to have "ran" from the vehicle once he parked the car.  (Lasher Dep. at 136.)

Second, the plaintiff contends that, during a meeting, Sims sat across from her and "started his smiling routine that he had exhibited when he was doing the chest thing, coat thing" at the restaurant.  (Id. at 152.)  The plaintiff has stated that "[i]t was not your normal smile."  *Id.*  After the meeting, while the plaintiff and Sims were cleaning up the table, Sims

allegedly smiled suggestively at the plaintiff and then made a gesture as if he was straightening a jacket, apparently, to the plaintiff, imitating the Macaroni Grill incident. (Id. at 154.)  The plaintiff then told Sims she wanted to talk with him in a nearby office.  *Id*. When they entered the office she contends that he stepped toward her at which time she pushed him back. (Id. at 155.)  The plaintiff claims that she said, "I don't know what kind of a floozie you think I am, but I want this to stop.  Stop right now." *Id*.

Finally, the plaintiff claims that a couple of months after the second incident, the plaintiff was thanking some co-workers for work performed on a particular project. (Id. at 163.)  Sims allegedly asked her if he could talk with her in a nearby office.  *Id*.  When she entered, he shut the door and said that he wanted to tell her "good job" on the project. *Id*. The plaintiff alleges that Sims then "grabbed" her and put her "in sort of a bear hug" whereby he rubbed her chest against his. (Id. at 163-64.)

Genuine issues of fact likely exist as to whether the conduct complained of was severe or pervasive.  As stated, relevant considerations include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.     Here, Sims made at least three advances toward the plaintiff.  The plaintiff has alleged that each time she was alone with Sims and felt either physically threatened or "scared." (Lasher Dep. at 134, 136, 155, 163-64.)   In fact, the plaintiff's allegations indicate that Sims either actually touched her or made a move to touch her in each case.  *Id.*  A reasonable jury might conclude that the three instances were severe enough to constitute a hostile work environment.  Whether or not the plaintiff has produced evidence that the  conduct of Sims actually altered "the terms and conditions" her employment, however, is less certain, *Faragher*, 524 U.S. at 788, though, the Court would be disinclined to so conclude on summary judgment.

But, even if genuine issues of fact exist concerning the severity and pervasiveness of Sims alleged conduct, the plaintiff's hostile work environment claim concerning Sims must fail because there is no basis for imputing liability to the defendant.

The *Faragher/Ellerth* affirmative defense is not relevant to Sim's misconduct because he was not the plaintiff's supervisor or otherwise "aided in the agency relation." *Ellerth*, 524 U.S. at 762; *see Mikels v. City of Durham, N.C.,* 183 F.3d 323, 329 (4th Cir.1999) (discussing the effect of *Faragher* and *Ellerth* decisions). Instead, an employer may be liable for the harassment of one co-worker by another if "after having acquired actual or constructive knowledge of the allegedly harassing conduct, the employer had taken 'no prompt and adequate remedial action [to correct it].'" *Mikels v,* 183 F.3d at 329 (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir.1983)). Thus, if an employer responds promptly and the "remedial response results in the cessation of the complained of conduct, liability must cease as well." *See Spicer v. Com. of Va., Dept. of Corrections*, 66 F.3d 705, 711 (4th Cir. 1995).

To that end, it is undisputed, that the plaintiff reported the second incident concerning Sims to the Manager of Human Resources, Jim Rivet. The plaintiff, however, specifically asked that no action be taken at that time. (Lasher Dep. at 144.) After the third incident, the plaintiff reported Sims to Bouknight who immediately called Rivet to schedule a meeting. (Id. at 169.) The defendant conducted an investigation in which Rivet interviewed, the plaintiff, Sims, Carter, and Jack Penley, Vice President of Construction. At the conclusion of the investigation, Sims received disciplinary action, including a report in his personnel file. (Def. Mem. Summ. J. Ex. 1 at Def. Ex. 16 (Investigation Report); Def. Mem. Summ. J. Ex. 5 (Employee Counseling Report).) Sims was required to take a course on "Responsibility and Respect;" discontinue any physical contact with all employees; and read and understand the defendant's "Responsibility and Respect" policy. (Def. Mem. Summ. J. Ex. 5 at 1.) The plaintiff does not dispute that such actions were taken and has testified that

she had no further problems with Sims.  (Lasher Dep. at 173.)  Accordingly, there was a complete "cessation of the complained of conduct."  *Spicer*, 66 F.3d at 711.

As a result, the evidence speaks of only one conclusion at which a reasonable jury could arrive – that the defendant acted promptly and adequately to the plaintiff's complaint concerning Sims.  It cannot be contended that any genuine issues of fact remains in that regard.  The defendant's remedial response, therefore, is effective, as a matter of law, to defeat the plaintiff's harassment claim.

## II.    Retaliation

The plaintiff also claims that she was unlawfully terminated for reporting Starr's alleged sexual harassment to the defendant's human resources department.  Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  The  *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII.  *See Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000).  The defendant does not attempt to use direct evidence to establish her claim of retaliation.

To prevail, the plaintiff must first establish a *prima facie* case of Title VII retaliation, by proving three elements: (1) that she engaged in a protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action.  *See EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a "legitimate, non-discriminatory reason" for the termination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant

6: 06-cv-01681-WMC    Date Filed 06/15/07    Entry Number 68    Page 19 of 23

meets this burden, then the plaintiff must show that the explanation for the decision to terminate her was, in fact, a pretext for intentional retaliation. *See Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147-48 (2000).

### A.   *Prima Facie* Case

The defendant first argues that the plaintiff cannot make out a *prima facie* case because she did not engage in a protected activity.  It is undisputed that the plaintiff complained to Rivet concerning Starr's alleged conduct on January 12, 2004. (Lasher Aff. ¶ 8; Rivet Dep. at 66.) The defendant contends, however, that because Starr's conduct did not constitute a hostile work environment, then she was not reporting any conduct violative of Title VII.[2] Although the plaintiff does not cite the case specifically, the Fourth Circuit has, in fact, adopted such a rule in *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006).  In *Jordan*, the Fourth Circuit agreed with the current plaintiff's reasoning that a claim for retaliation cannot lie where the plaintiff has opposed an activity with no objectively reasonable belief that the activity violated Title VII.  *Id*. at 339-40.  Unlike *Jordan*, however, the Court has already concluded that genuine issues exist as to whether Starr's actions constituted a hostile work environment.  For the same reasons, the Court concludes that the plaintiff's belief that she was reporting harassment violative of Title VII was objectively reasonable.  *See id.*

Although the defendant contends that the plaintiff also cannot establish the third element of her *prima facie* case, mere temporal proximity between the plaintiff's protected activity on January 12, 2004, and the termination of her employment on January 16, 2004 is enough, as a matter of law, to satisfy the causal element of her *prima facie* case.  The Fourth Circuit has held that "very little evidence of a causal connection is required to

---

[2]  In its first memorandum in support of summary judgment, the defendant actually treats the plaintiff's retaliation claim as one based on complaints made against Sims. (Def. Mem. Supp. Summ. J. at 27.)  But, the defendant in a footnote claims that the argument, described above, would apply for complaints made concerning Starr, as well.  *Id*. n.11.

19

establish a prima facie case" and "merely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient" to satisfy the causation element of a *prima facie* retaliation case. *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452 (4th Cir.1989) (holding three month time period between protected activity and termination sufficient to satisfy the causation element of the *prima facie* case of retaliation); *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding causal link between filing of retaliation complaints and the plaintiff's demotion five months later). Accordingly, the plaintiff has made a showing that a causal connection exists between her protected activity and the adverse employment action taken against her.

### B.     Legitimate Non-Discriminatory Reason

The defendant has met its burden of production by stating that the reasons for the termination of the plaintiff's employment were purely economic and related to a team-wide layoff "made necessary by the Greenville office's alarmingly high overhead costs and lack of profitability" (Def. Mem. Summ. J. at 13). (*See* McAreavy Dep. at 17-18; Ucciferro Dep at 1-2.) Such economic concerns are legitimate and nondiscriminatory reasons for layoff. *See Birkbeck v. Marvel Lighting Corp.,*30 F.3d 507, 513 (4th Cir. 1994) ("In contrast to plaintiffs' proffers, Marvel provided substantial support for its claim that the layoffs here were motivated purely by economic concerns.").

### C.     Pretext

Because the defendant has proffered legitimate, non-discriminatory reasons for termination, the plaintiff bears the burden of demonstrating that the real reason for discharge is an illegal one. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000).     As is most common, the plaintiff attempts to satisfy this burden by suggesting that the defendant's' proffered reasons are pretextual or false. *See id.* at 144.

Specifically, the plaintiff contends that on January 15, 2004, the day before her termination and three days after her complaint concerning Starr, the defendant's new President, Mike McAreavy announced that there would be no new layoffs. (Lasher Aff. ¶ 8.) Notwithstanding the January 15 announcement, the plaintiff's employment was terminated the very next day. The plaintiff has also submitted affirmative evidence that she was specifically rejected as a part of the layoff planned prior to the announcement. (Bouknight Aff. ¶ 5.)

The defendant, as far as the Court can discern, has not made any effort to admit or refute that McAreavy made such an announcement concerning the end of the layoffs. Nor has the defendant made any effort to reconcile the decision to lay off the plaintiff after such an announcement, if, in fact, it was made. Instead, the defendant cites to substantial evidence that McAreavy was (1) the only decisionmaker; (2) motivated exclusively by economic factors; and (3) unaware of any harassment complaint made by the plaintiff. (See, e.g., McAreavy Dep. at 2, 17-18, 32, 36, 52; Rivet Dep. at 72.)

The Court, however, finds that the plaintiff's evidence concerning the announcement and her subsequent termination are facts from which a jury could find that the defendant's proffered reasons were false. Assuming that a jury believed such an announcement had been made, which it reasonably might, the defendant has offered no explanation for how economic considerations changed after the announcement, such that the additional termination of the plaintiff was necessary. Further, although the defendant contends that McAreavy was unaware of any complaint made by the plaintiff, a reasonable jury might conclude otherwise based exclusively on the fact that the plaintiff's employment was terminated after it was indicated that no more layoffs would occur. In other words, a jury would be reasonable in concluding, in the absence of some other explanation, that McAreavy must have been given specific information, after the announcement, regarding the plaintiff and possibly concerning her complaint, which persuaded him to renege on the

announcement's fundamental promise.  The defendant's failure to rejoin the announcement evidence raises serious questions concerning their proffered reason for termination.

Accordingly, the plaintiff has created a genuine issue of fact as to whether the defendant's legitimate, non-discriminatory reason was pretextual.

**III.     Intentional Infliction of Emotional Distress and Negligent Retention**

The plaintiff has not renewed any arguments concerning her Intentional Infliction of Emotional Distress and Negligent Supervision/Retention claims, in her supplemental briefing, and, therefore, appears to have abandoned them.   Notwithstanding, they are preempted by the South Carolina Worker's Compensation Act, *see* S.C. Code § 42-1-310, because they allege personal injury arising out of and in the course of her employment. *Sabb v. South Carolina State University,* 567 S.E.2d 231, 234 (S.C. 2002) (negligent supervision); *Loges v. Mack Trucks, Inc.*, 417 S.E.2d 538 (S.C.1992) (intentional infliction of emotional distress) ("[A]llegations of intentional infliction of emotional distress, assault and battery as these constitute personal injuries within the scope of the Act."); *Dickert v. Metropolitan Life Ins. Co.*, 428 S.E.2d 700 (1993) (the Act provides exclusive remedy for employees who sustain work-related injury; claim of negligence for failure to exercise reasonable care in selection, retention, and supervision of co-employee is covered by the Act).   Accordingly, they should be dismissed.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment be GRANTED, in part, and DENIED, in part.  Specifically, it is recommended that summary judgment be granted as to the plaintiff's claims for intentional infliction of emotional distress, negligent retention, and hostile work environment (relating to the conduct of Tom Sims).  It is further recommended that summary judgment not be granted as to the plaintiff's retaliation claim and hostile work environment claim (relating to the conduct of Guy Starr).

IT IS SO RECOMMENDED.

Bruce H. Hendricks

BRUCE H. HENDRICKS
UNITED STATES MAGISTRATE JUDGE

June 15, 2007
Greenville, South Carolina

23